## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN WINFIELD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-447-RGA |
| | ) |
| ELOXX PHARMACEUTICALS, INC., | ) |
| DAVID RECTOR, JAMES SCHMIDT, | ) |
| BARRY HONIG, and DOES 1-10, | ) |
| inclusive, | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Presently before the court in this securities action for violations of Sections 10(b) and 20

of the Securities Exchange Act of 1934 (the "Exchange Act") are the following motions:[1] (1) the

motion to dismiss for failure to state a claim under Rule 12(b)(6), filed by defendants Eloxx

Pharmaceuticals, Inc.[2] ("Eloxx" or "the Company"), David Rector, and James Schmidt (D.I. 8);

and (2) the motion to dismiss for failure to state a claim under Rule 12(b)(6), filed by defendant

Barry Honig (together with Eloxx, Mr. Rector, and Mr. Schmidt, "Defendants") (D.I. 11). For

the following reasons, I recommend that the court grant-in-part the motion to dismiss filed by

Eloxx, Mr. Rector, and Mr. Schmidt, and deny the motion to dismiss filed by Mr. Honig.

### II. BACKGROUND

Plaintiff John Winfield ("Plaintiff") is an individual investor who owns 40,000 shares of

the Company's common stock. (D.I. 1 at ¶ 1) In July 2016, Plaintiff bought 200 shares of Series

---

[1] The briefing, declarations, and other filings associated with the pending motions can be found
at D.I. 9, D.I. 10, D.I. 12, D.I. 13, D.I. 20, D.I. 21, D.I. 22, and D.I. 23.

[2] Eloxx was formerly known as Sevion Therapeutics, Inc. (D.I. 1 at ¶ 2)

A preferred stock which were convertible into 266,666 shares of common stock. (*Id.* at ¶ 8) Months later, Plaintiff was contacted by Mr. Rector, the Company's interim chief executive officer ("CEO"), and Mr. Honig, an independent investor. (*Id.* at ¶¶ 3, 5, 13) Mr. Rector and Mr. Honig explained that the Company was low on financing, and it was necessary to convert all Series A preferred shares to common shares before the Company could obtain additional capital. (*Id.* at ¶¶ 9, 13) Accordingly, Mr. Rector and Mr. Honig encouraged Plaintiff to enter into an agreement to convert his Series A preferred shares to common shares at a more favorable price. (*Id.* at ¶ 10) Plaintiff conditioned his agreement to the conversion price on the inclusion of a most-favored-nations provision, which would require the Company to provide notice to Plaintiff of lower conversion rates offered to other investors, and offer those lower conversion rates to Plaintiff. (*Id.*)

On January 18, 2017, Plaintiff executed the Preferred Stock Exchange Agreement (the "Agreement") with the Company. (D.I. 1 at ¶¶ 11-13) Pursuant to the terms of the Agreement, Plaintiff agreed to exchange his Series A preferred stock for shares of common stock at a $0.25 per share conversion rate, which would amount to 800,000 shares of common stock. (*Id.* at ¶¶ 10-11) Section 2.2(g) of the Agreement also included a provision promising to notify Plaintiff of any more favorable terms and conditions offered to others and amend the terms of Plaintiff's Agreement to match the more favorable terms and conditions:

> The Company hereby represents and warrants as of the date hereof and covenants and agrees from and after the date hereof that none of the terms offered to any person with respect to any consent, release, amendment, settlement or waiver relating to the terms, conditions and transactions contemplated hereby (each a "Settlement Document"), is or will be more favorable to such person than those of the Holder and this Agreement. If, and whenever on or after the date hereof, the Company enters into a Settlement Document, then (i) the Company shall provide notice thereof to the Holder immediately following the occurrence thereof and (ii) the terms and conditions of this Agreement shall be, without any further action by

2

the Holder or the Company, automatically amended and modified in an economically and legally equivalent manner such that the Holder shall receive the benefit of the more favorable terms and/or conditions (as the case may be). . . .

(*Id.* at ¶ 12; D.I. 13, Ex. C at 5) Plaintiff did not immediately convert his preferred shares to common stock after executing the Agreement. (D.I. 1 at ¶ 13)

In the weeks after Plaintiff executed the Agreement, Mr. Rector and Mr. Honig pressured Plaintiff to convert his Series A preferred shares to common shares in a series of telephone calls and emails. (*Id.* at ¶¶ 9, 13-15) Mr. Rector represented that Plaintiff's delay in converting his preferred shares could jeopardize the necessary financing. (*Id.* at ¶ 14) Mr. Honig indicated that he expected to buy all other unconverted Series A preferred shares, and he promised Plaintiff that he would receive the most favorable conversion price for his Series A preferred shares. (*Id.* at ¶ 15) Plaintiff refused to convert his shares before receiving confirmation that all other Series A preferred shares had been converted at the same price offered to Plaintiff. (*Id.* at ¶¶ 13, 15)

In filings made with the Securities and Exchange Commission ("SEC") in May 2017, the Company represented that 110 shares of Series A preferred stock were converted to common stock on February 15, 2017 at an exchange price of $0.25 per share, and 270 shares of Series A preferred stock remained outstanding. (D.I. 1 at ¶ 16) Mr. Honig contacted Plaintiff on May 25, 2017, disclosing that he planned to buy the remaining 70 shares of Series A preferred stock and encouraging Plaintiff to convert his Series A preferred shares at the $0.25 exchange price. (*Id.* at ¶¶ 17-18)

In a June 2017 SEC filing, the Company publicly announced that it had agreed to a merger with Eloxx Pharmaceuticals Ltd. on May 31, 2017.[3] (D.I. 1 at ¶ 19) As a condition precedent to the completion of the merger, the Company was required to convert all outstanding

---

[3] The merger was ultimately consummated on December 19, 2017. (D.I. 1 at ¶ 31)

Series A preferred stock into common stock. (*Id.* at ¶¶ 19-20) Mr. Schmidt, the Company's interim chief financial officer ("CFO") during the relevant time frame, informed Plaintiff that the holder of the remaining 70 shares of Series A preferred stock had reached an agreement with the Company to tender the shares at a conversion price of $0.25 per share. (*Id.* at ¶ 21)

In or around July 2017, Plaintiff converted his 200 shares of Series A preferred stock into 800,000 shares of common stock at a conversion price of $0.25 per share. (D.I. 1 at ¶ 22) The following month, Mr. Honig purchased the 70 outstanding Series A preferred shares and reached his own agreement with the Company to convert those shares to common stock at $0.10 per share. (*Id.* at ¶¶ 23-24) Mr. Honig converted the Series A preferred shares to common stock on August 24, 2017 at the $0.10 conversion price to obtain 700,000 shares of common stock. (*Id.* at ¶¶ 24-25)

Plaintiff learned about Mr. Honig's conversion price from the 2017 Form 10-K filed with the SEC in October 2017. (D.I. 1 at ¶¶ 23-24) The Form 10-K also disclosed that the Company amended its convertible notes to provide noteholders, including OPKO Health, Inc. ("OPKO") and its CEO, Dr. Phillip Frost, a conversion price of $0.10 on February 15, 2017 and May 22, 2017. (*Id.* at ¶¶ 27-30) The Company did not notify Plaintiff of its preferred stock exchange agreement with Mr. Honig or its amendment of the convertible notes. (*Id.* at ¶ 33)

On September 7, 2018, the SEC filed a complaint in the Southern District of New York against Dr. Frost, Mr. Honig, OPKO, and several others, alleging that they had orchestrated three "pump-and-dump" schemes from 2013 through 2018.[4] (D.I. 1 at ¶ 28) Specifically, the SEC

_____

[4] The SEC defines "pump-and-dump" schemes as follows:

> In a pump and dump scheme, fraudsters typically spread false or misleading
> information to create a buying frenzy that will "pump" up the price of a stock and

complaint alleged that Mr. Honig, Dr. Frost, and OPKO "acted as an undisclosed control group to promote the stock of public companies through misleading public statements, and then sold their stock for profit." *(Id.)* Defendants did not disclose to Plaintiff the nature of Mr. Honig's relationship to Dr. Frost and OPKO. *(Id.)*

## III.    LEGAL STANDARD

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790-91 (3d Cir. 2016).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations

---

then "dump" shares of the stock by selling their own shares at the inflated price. Once the fraudsters dump their shares and stop hyping the stock, the stock price typically falls and investors lose money. False or misleading information about a company's stock price may be spread through sources including social media, investment research websites, investment newsletters, online advertisements, email, Internet chat rooms, direct mail, newspapers, magazines, and radio. Microcap companies are particularly vulnerable to pump and dump schemes because there is often limited publicly-available information about microcap companies.

SEC, *Pump and Dump*, https://www.investor.gov/glossary/glossary_terms/pump-dump (last visited January 10, 2020).

allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal citations and quotation marks omitted). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## IV. DISCUSSION

### A. Breach of Contract[5]

To state a claim for breach of contract under Delaware law, a plaintiff must allege facts sufficient to plausibly infer the existence of "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff[ ]." *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011) (citing *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010)).

#### 1. Identification of specific contractual provision

In support of their motion to dismiss the cause of action for breach of contract, Eloxx, Mr. Rector, and Mr. Schmidt first contend that the complaint fails to state a claim because

---

[5] The complaint asserts the fourth cause of action for breach of contract only against the Company. (D.I. 1 at 14)

6

Plaintiff does not identify a specific contractual provision that was breached. (D.I. 9 at 5-6) This argument has no merit. Paragraph 12 of the complaint adequately identifies a specific contractual provision by quoting at length Section 2.2(g) of the Agreement. (D.I. 1 at ¶ 12) The complaint does not quote any other provision of the Agreement. In the fourth cause of action for breach of contract, Plaintiff re-alleges paragraph 12 of the complaint and specifically asserts that "[t]he Company breached the terms of the Preferred Stock Exchange Agreement by failing to provide notice to Plaintiff of the conversion of other shares of series A preferred stock at a more favorable conversion price of $0.10 per share." (*Id.* at ¶¶ 56, 60) This allegation falls squarely within the language of Section 2.2(g). In this regard, the facts before the court are distinguishable from those in *Anderson v. Wachovia Mortgage Co.*, in which the complaint failed to identify "any express contract provision that was breached." 497 F. Supp. 2d 572, 581 (D. Del. 2007) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006)).

## 2. Sufficiency of allegations

Eloxx, Mr. Rector, and Mr. Schmidt further argue that the complaint's allegations regarding the Company's failure to notify Plaintiff about the conversion of other Series A preferred shares at a more favorable conversion price do not amount to a breach of the Agreement. (D.I. 9 at 6) According to Eloxx, Mr. Rector, and Mr. Schmidt, Section 2.2(g) does not grant most-favored-nations status to Plaintiff regarding the conversion price because the conversion price is not properly categorized as a "consent, release, amendment, settlement or waiver." (*Id.* at 7)

In response, Plaintiff contends that the primary purpose of the Agreement was to induce preferred stockholders to convert their shares based on the favorable conversion price. (D.I. 20 at 24) Plaintiff alleges that the Company breached the Agreement by entering into an agreement

7

with Mr. Honig including a $0.10 conversion price, failing to notify Plaintiff of that agreement, and failing to extend the same conversion price to Plaintiff. (*Id.*)

The parties' dispute centers on the scope of Section 2.2(g) of the Agreement, raising an issue of contract interpretation that is not appropriately resolved on a motion to dismiss. Section 2.2(g) of the Agreement promises that "none of the terms offered to any person with respect to any consent, release, amendment, settlement or waiver relating to the terms, conditions and transactions contemplated hereby (each a 'Settlement Document'), is or will be more favorable to such person than those of the Holder and this Agreement." (D.I. 10, Ex. 1 at 4-5) Section 2.2(g) further obligates the Company to notify Plaintiff if it enters into a Settlement Document and amend the terms of the Agreement to ensure Plaintiff "receive[s] the benefit of the more favorable terms and/or conditions. . . ." (*Id.* at 5)

The complaint alleges that the conversion of Mr. Honig's Series A preferred shares amounted to a consent pursuant to Section 2.2(g) of the Agreement: "The conversion transaction described above constituted a consent by Honig to the conversion of 70 shares of series A preferred stock into 700,000 shares of common stock at a conversion price of $0.10 per share or less, terms substantially and materially more favorable than those offered to Plaintiff. . . ." (D.I. 1 at ¶ 25) The complaint further alleges that the Company "amended certain convertible notes" to provide a conversion price of $0.10 to holders of the notes. (*Id.* at ¶ 27) Defendants' challenge to Plaintiff's interpretation of "consent" and "amendment," as used in Section 2.2(g) of the Agreement, raises an issue of fact to be resolved at a later stage of the case.[6]

---

[6] At oral argument, counsel for Plaintiff also cited the January 29, 2017 email communication from Mr. Rector to Plaintiff, in which Mr. Rector characterizes the conversion of shares as a "waiver and consent": "You executed and returned via fax the proposed waiver and consent to convert your position at the one-time ratchet of $0.25. . . ." (D.I. 1 at ¶ 14; D.I. 21, Ex. 3 at 10)

During oral argument, the parties also raised a factual dispute regarding when the closing

of the Agreement (the "Closing") occurred. Specifically, counsel for Defendants argued that the

Closing occurred when the Agreement was executed, and Plaintiff was contractually obligated at

that time to tender his stock certificate. Plaintiff's position is that the Closing did not occur until

Plaintiff tendered his stock certificate. Plaintiff's position is plausible under the terms of the

Agreement. Section 1.1 of the Agreement provides that "[t]he Exchange shall occur remotely

via the exchange of signatures on such later date as determined by the Company (the 'Closing')."

(D.I. 10, Ex. 1 at § 1.1) This language plausibly suggests that the Closing occurred later than the

execution of the Agreement, and it was dependent on the conversion of the Series A preferred

shares to common shares (defined as the "Exchange" in the Agreement). Section 1.3 of the

Agreement also describes the Closing in terms of the exchange of preferred shares for common

shares. (*Id.* at § 1.3)

### 3. Integration clause

Eloxx, Mr. Rector, and Mr. Schmidt further allege that, "[t]o the extent that Plaintiff's

breach of contract and covenant of good faith and fair dealing claims are premised on

representations not contained in the Agreement, they must be dismissed." (D.I. 9 at 7)

However, Plaintiff's fourth cause of action for breach of contract does not rely on representations

made outside the four corners of the Agreement. Instead, the cause of action is limited to the

---

Plaintiff did not attach a copy of the January 29, 2017 email to the complaint. Plaintiff quotes a
portion of the document in the pleading which omits the "waiver and consent" language. (D.I. 1
at ¶ 14) Under these circumstances, the court may only consider the email to establish the truth
of its existence, not the truth of its contents. *See Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d
Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. at 557, *as recognized in In re
Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017); *Gewirtz v. Opko Health, Inc.*, 230 F.
Supp. 3d 440, 445 (E.D. Pa. 2017) ("SEC filings may not be considered for the truth of their
contents on a motion to dismiss.").

following allegations: (1) the Agreement was executed on January 18, 2017, promising a
conversion price of $0.25 per share "or any more favorable conversion price extended to any
other party," (D.I. 1 at ¶ 57); (2) Plaintiff delivered his stock certificate to the Company in
accordance with the Agreement, (*id.* at ¶ 59); (3) the Company breached the Agreement by
failing to provide notice of the $0.10 per share conversion price offered to others, (*id.* at ¶ 60);
(4) the Company breached the Agreement by failing to match the more favorable terms offered
to others, (*id.* at ¶ 61); and (5) this resulted in injury to Plaintiff, (*id.* at ¶ 62). Plaintiff's cause of
action for breach of contract makes no mention of the alleged misrepresentations made by Mr.
Rector, Mr. Schmidt, or Mr. Honig, and is instead based solely on the terms of the Agreement
itself. As a result, the integration clause does not preclude Plaintiff's cause of action for breach
of contract.

For the foregoing reasons, I recommend that the court deny the motion to dismiss
Plaintiff's fourth cause of action for breach of contract.

## B. Breach of the Implied Covenant of Good Faith and Fair Dealing[7]

In Delaware, every contract contains an implied covenant of good faith and fair dealing.
*Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). The implied covenant
requires the parties to the contract "to refrain from arbitrary or unreasonable conduct which has
the effect of preventing the other party to the contract from receiving the fruits of the contract."
*HSMY, Inc. v. Getty Petroleum Mktg., Inc.*, 417 F. Supp. 2d 617, 621 (D. Del. 2006) (internal
citation omitted); *see also Restatement (Second) of Contracts*, § 205 (1981). Obligations based
on the covenant of good faith and fair dealing should be implied only in "rare and fact-intensive"

---

[7] The complaint asserts the fifth cause of action for breach of the implied covenant of good faith
and fair dealing only against the Company. (D.I. 1 at 15)

cases which "turn[ ] on issues of compelling fairness." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998). A plaintiff must allege the breaching party's actions were motivated by an improper purpose reflecting bad faith. *See Dunlap*, 878 A.2d at 442.

"[T]o state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege: 'a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.' " *TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 330 (D. Del. 2014) (citing *Anderson v. Wachovia Mtg. Corp.*, 497 F. Supp. 2d 572, 581- 82 (D. Del. 2007)). The focus is whether the parties would have prohibited the conduct had they contemplated it or thought to negotiate about it at the time of contract formation. *See Cincinnati SMSA*, 708 A.2d at 992. "The implied covenant does not apply when the subject at issue is expressly covered by the contract." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) (internal citations and quotation marks omitted).

Eloxx, Mr. Rector, and Mr. Smith contend that the complaint fails to allege a cause of action for breach of the implied covenant of good faith and fair dealing because it does not allege the existence of a specific implied contractual obligation. (D.I. 9 at 8-9) They further allege that the cause of action is duplicative of the allegations for breach of contract because both causes of action are premised on the Company's alleged failure to comply with the agreement based on the more favorable conversion rate given to Mr. Honig and OPKO. (D.I. 9 at 9-10)

In response, Plaintiff argues that the complaint identifies an implied contractual provision because all Delaware contracts contain an implied covenant of good faith and fair dealing. (D.I. 20 at 24) According to Plaintiff, the purpose of the Agreement was to give Plaintiff the best

11

conversion price, and the Company's SEC filings make clear that it failed to do so. (D.I. 20 at 25)

I recommend that the court grant the motion to dismiss Plaintiff's fifth cause of action for breach of the implied covenant of good faith and fair dealing.[8] The law is clear that a plaintiff asserting a claim for breach of the implied covenant "must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (dismissing claim for breach of the implied covenant because plaintiff's "alleged injuries that result from defendants' purported failure to pay him amounts to which he is entitled under the . . . Agreement are, according to the complaint, governed by express provisions of the . . . Agreement."). Plaintiff does not adequately identify an implied contractual obligation. The fact that the implied covenant of good faith and fair dealing attaches to every contract by operation of law does not excuse a plaintiff from identifying "a specific implied contractual obligation and alleg[ing] how the violation of that obligation denied the plaintiff the fruits of the contract." *Kuroda*, 971 A.2d at 888. Plaintiff's failure to identify an implied contractual term is fatal to its cause of action for breach of the implied covenant. *See Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *4 (Del. Ch. Jan. 30, 2015); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (D. Del. 2006) (plaintiff failed to identify any "implied contract term that it would have the trial court read into the contract.").

---

[8] At oral argument on January 14, 2020, counsel for Plaintiff indicated that the cause of action for breach of the implied covenant of good faith and fair dealing is pleaded only in the alternative, in the event that the court grants dismissal of the breach of contract claim. (1/14/20 Tr.)

12

Plaintiff's cause of action for breach of the implied covenant is also deficient because it is based on the same underlying facts as the cause of action for breach of the express terms of the Agreement. The complaint alleges that Plaintiff and the Company entered into the Agreement, Plaintiff fully performed under the Agreement, the Company obtained the conversion of Plaintiff's Series A preferred shares on terms less favorable than those extended to Mr. Honig and OPKO, and Plaintiff suffered injury as a result. (D.I. 1 at ¶¶ 64-67) These contentions mirror the cause of action for breach of contract by alleging a violation of the Company's express contractual obligation to give Plaintiff the most favorable conversion price. *See Fortis*, 2015 WL 401371, at \*3 ("Where the contract speaks directly regarding the issue in dispute, '[e]xisting contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty unattached to the underlying legal documents.'" (quoting *Dunlap*, 878 A.2d at 441)).

## C. Securities Fraud Under Section 10(b) and Rule 10b-5

To state a claim for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). To survive a motion to dismiss, a plaintiff alleging securities fraud is required to adhere to the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). Rule 9(b) requires plaintiffs to "support their allegations of securities fraud with all of the essential factual background that

13

would accompany 'the first paragraph of any newspaper story''—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Center Prop. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington Coat Factory*, 114 F.3d at 1422).

## 1. Misstatement or omission

In support of their motion to dismiss, Eloxx, Mr. Rector, and Mr. Schmidt contend that the complaint fails to identify which statements were allegedly false or misleading and why. (D.I. 9 at 12) According to Eloxx, Mr. Rector, and Mr. Schmidt, the complaint identifies statements representing that Plaintiff would receive the lowest conversion price, but it fails to suggest that the statements were false at the time they were made or that Defendants told Plaintiff he had received the lowest conversion price after Mr. Honig converted his preferred shares. *(Id.* at 13) They also argue that allegations made "on information and belief" regarding the coordination among Defendants to misrepresent the most favorable conversion price are inadequate under the PSLRA and Rule 9(b) because they lack particularized factual support. (D.I. 9 at 11-12)

In response, Plaintiff argues that Mr. Rector, Mr. Schmidt, and Mr. Honig engaged in a campaign to induce Plaintiff to tender his stock certificate for conversion at the $0.25 conversion price after the execution of the Agreement. (D.I. 20 at 16) During this time, Plaintiff alleges that Defendants falsely told Plaintiff that no other shareholder was converting at a lower price. *(Id.* at 17) According to Plaintiff, the complaint pleads that these statements were false when made because Defendants knew Mr. Honig would receive a more favorable conversion price after Plaintiff tendered his stock certificate. *(Id.)*

The complaint adequately pleads a misstatement or omission by Eloxx, Mr. Rector, and Mr. Schmidt. The PSLRA requires the plaintiff to "specify each statement alleged to have been

14

misleading, the reason or reasons why the statement is misleading, and, [for allegations] made on information and belief, the . . . facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also In re Suprema*, 438 F.3d at 276. The complaint alleges that "Plaintiff made clear to Honig and Rector that he would agree to convert only if the Company (1) granted him most-favored-nations status with respect to the conversion price . . . and (2) granted to Plaintiff the right to also convert at the lower price (even retroactively)." (D.I. 1 at ¶ 10) Nonetheless, Mr. Rector, Mr. Schmidt, and Mr. Honig allegedly promised that Plaintiff would receive the lowest conversion price and pressured Plaintiff to complete the conversion at the $0.25 conversion price on that basis. (*Id.* at ¶¶ 14-15, 18, 21) The complaint identifies the specific dates the communications were made by specific Defendants in accordance with the PSLRA's requirement to "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (citing 15 U.S.C. s 78u—4(b)(1)(B)).

The complaint adequately pleads the falsity of Defendants' statements by alleging that Plaintiff's subsequent review of the Company's SEC filings revealed that Mr. Honig converted the remaining 70 shares of Series A preferred stock at a conversion price of $0.10 per share. (*Id.* at ¶ 24) The complaint alleges that Mr. Honig, Mr. Rector, and Mr. Schmidt acted in concert to misrepresent the conversion price to Plaintiff and provide Mr. Honig with the most favorable conversion price. (*Id.* at ¶ 26) The timing of Mr. Honig's conversion only a few weeks after Plaintiff's conversion gives rise to a strong inference that Defendants' statements regarding the most favorable conversion price were false at the time they were made. *See Institutional Inv'rs*

15

*Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (shareholders must specify the reasons why the misrepresentations were false or misleading when made); *see also* § IV.C.2, *infra*.

The complaint contains two allegations made on information and belief. (D.I. 1 at ¶¶ 26-27) Allegations made on information and belief may satisfy the PSLRA so long as the complaint includes "all facts supporting that belief with particularity." *Winer Family Trust*, 503 F.3d at 326. In this case, the complaint alleges that Mr. Honig, Mr. Rector, and Mr. Schmidt acted together to misrepresent that Plaintiff would receive the lowest conversion price for his Series A preferred stock. (D.I. 1 at ¶ 26) Previous allegations in the complaint set forth with particularity a series of coordinated communications by Mr. Honig, Mr. Rector, and Mr. Schmidt to pressure Plaintiff into tendering his stock certificate. (*Id.* at ¶¶ 10, 13-15, 18, 21-22)

The complaint further alleges that, "[o]n information and belief, the Company, Honig, Rector, and Schmidt acted in concert, under the direction and control of Honig, to conceal from Plaintiff the amendment to the November Notes providing for a materially more beneficial conversion price. . . ." (*Id.* at ¶ 27) The pleading supports this allegation with particularized facts describing that, on February 15, 2017 and May 22, 2017, the Company amended convertible notes to provide noteholders with a conversion price of $0.10 after Plaintiff executed the Agreement. (*Id.*) The complaint alleges that Plaintiff first learned of these amendments from the 2017 Form 10-K filed in October 2017, despite Plaintiff's multiple communications with Mr. Rector, Mr. Schmidt, and Mr. Honig between February and May 2017 when the amendments were being made. (*Id.*)

## 2. Scienter

Defendants contend that the complaint contains only conclusory statements about Defendants' knowledge and fails to attribute particular misstatements or omissions to a particular

Defendant. (D.I. 9 at 12, 14; D.I. 12 at 11) They further allege that the complaint does not support allegations of fraudulent behavior with facts indicating that Mr. Rector, Mr. Schmidt, and Mr. Honig were motivated by a desire for Mr. Honig to profit at Plaintiff's expense. (D.I. 9 at 14-15)

In response, Plaintiff contends that the complaint adequately pleads facts showing the motive and opportunity to commit fraud because Mr. Rector, Mr. Schmidt, and Mr. Honig would lose a substantial amount of value for their holdings if Plaintiff did not tender his stock certificate and the Company failed to obtain financing as a result. (D.I. 20 at 17) According to Plaintiff, these facts demonstrate that Defendants had a strong motive to obtain Plaintiff's stock certificate by making fraudulent statements regarding the conversion price offered to Mr. Honig. (*Id.*) Plaintiff contends that the complaint presents more than a strong inference that Mr. Rector, Mr. Schmidt, and Mr. Honig already discussed the lower conversion price for Mr. Honig when they told Plaintiff that Mr. Honig's shares would be converted at $0.25 per share. (*Id.* at 18)

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind," i.e., that defendants acted with "scienter." 15 U.S.C. § 78u–4(b)(2)(A); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013). "A 'strong inference' of scienter is one that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.' " *Avaya*, 564 F.3d at 267 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2504-05 (2007)). "The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310 (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely 'reasonable' or 'permissible'—it must be

17

cogent and compelling, thus strong in light of other explanations." *Id.; see also City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011). A plaintiff can meet the "strong inference" requirement by "alleging facts to show that [the defendant] had both motive and opportunity to commit fraud" or by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington Coat Factory*, 114 F.3d at 1418.

The allegations in the complaint give rise to a strong inference of Defendants' scienter sufficient to satisfy the requisite standard under Section 10(b). *See Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 180 (D. Del. 2010) (holding that, where the complaint alleged defendants had been evasive regarding the reasons for accounting irregularities, it was at least as likely as not that defendants acted with scienter). The complaint identifies each individual defendant's role in a coordinated campaign to persuade Plaintiff to tender his stock certificate by representing that the $0.25 per share conversion price was the best available. (D.I. 1 at ¶¶ 10, 14-15, 18, 21) The timing of the events, as set forth in the complaint, gives rise to a strong inference that Mr. Rector, Mr. Schmidt, and Mr. Honig knew their statements were false at the time they were made. Specifically, the complaint alleges that Mr. Honig and the Company agreed to a conversion price of $0.10 per share weeks after Plaintiff tendered his stock certificate. (*Id.* at ¶ 24) Mr. Honig and the Company reached this agreement without notifying Plaintiff, despite the fact that Mr. Schmidt had just recently assured Plaintiff that "the other holder of the remaining series A preferred stock had reached an agreement and that those shares would be converted at the same price as in Plaintiff's agreement (i.e., $0.25 per share)." (*Id.* at ¶ 21)

18

The complaint further alleges that OPKO obtained a $0.10 conversion price for its convertible notes on February 22, 2017, months before Plaintiff was last assured that he was receiving the lowest conversion price.[9] (*Id.* at ¶¶ 18, 29-30) As a result of Plaintiff's ignorance of these transactions, Plaintiff tendered his stock certificate in exchange for 800,000 shares of common stock, instead of the 1,200,000 shares of common stock he would have received if he had been given the best available conversion price. (*Id.* at ¶¶ 22, 32-33) These allegations, viewed in the light most favorable to Plaintiff and read in the context of the complaint as a whole, give rise to the strong inference that Eloxx, Mr. Rector, and Mr. Schmidt acted with the requisite scienter.

Eloxx, Mr. Rector, and Mr. Schmidt take issue with the allegations at paragraphs 35 and 36 of the complaint, which describe the actions of "Defendants" as a group without specifically identifying conduct attributable to each individual defendant. (D.I. 9 at 14; D.I. 1 at ¶¶ 35-36) In the Third Circuit, group pleading is insufficient because allegations of scienter must be pled with particularity for each act or omission to satisfy the requirements of the PSLRA. *See Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007); *see also Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 702-03 (D. Del. 2010). Here, however, Plaintiff's complaint contains detailed allegations regarding each individual defendant's efforts to persuade

---

[9] During oral argument, counsel for Mr. Honig argued that the complaint's allegation regarding the SEC complaint against Mr. Honig, Dr. Frost, and OPKO is irrelevant to the present action. But the language of the complaint suggests that reference to the SEC complaint was made to establish Mr. Honig's "undisclosed relationship with OPKO Health, Inc. ('OPKO') and its Chief Executive Officer, Dr. Phillip Frost ('Frost')." (D.I. 1 at ¶ 28) This allegation adds factual specificity to the complaint's assertion that the $0.10 conversion price given to OPKO and Dr. Frost as noteholders was part of the coordinated effort by Mr. Honig. (*Id.* at ¶ 27) ("[T]he Company, Honig, Rector, and Schmidt acted in concert, under the direction and control of Honig, to conceal from Plaintiff the amendment to the November Notes providing for a materially more beneficial conversion price, at the expense and to the detriment of Plaintiff.").

19

Plaintiff to tender his stock certificate. (D.I. 1 at ¶¶ 10, 14-15, 18, 21) These allegations give rise to a strong inference that Mr. Rector, Mr. Schmidt, and Mr. Honig engaged in a coordinated effort to pressure Plaintiff into converting his shares at the $0.25 per share conversion price, despite their knowledge that a lower conversion price of $0.10 per share was given to convertible noteholders and would be given to Mr. Honig soon after Plaintiff tendered his stock certificate. (*Id.* at ¶¶ 24-30) Thus, the allegations of the complaint give rise to a strong inference of Defendants' scienter in accordance with the particularity requirements of the PSLRA.

At oral argument, counsel for Mr. Honig challenged the sufficiency of the scienter allegations against Mr. Honig in particular, arguing that the complaint lacks the requisite specificity. Counsel stressed that Mr. Honig had no reason to care about the number of shares or the conversion rate received by Plaintiff. But the complaint sufficiently establishes why Mr. Honig cared about Plaintiff's conversion price, quoting from an email sent by Mr. Rector identifying Mr. Honig as "the current lead investor." (D.I. 1 at ¶ 14) The complaint alleges that Plaintiff received 800,000 shares of common stock in exchange for 200 shares of Series A preferred stock, whereas Mr. Honig received 700,000 shares of common stock in exchange for just 70 shares of Series A preferred stock. (*Id.* at ¶¶ 22, 24-25) Moreover, it is plausible to infer that Mr. Honig had a vested interest in Plaintiff's transaction based on his campaign of communication with Mr. Rector, Mr. Schmidt, and Plaintiff to urge Plaintiff to convert his shares, as outlined in the complaint. (*Id.* at ¶¶ 9-10, 13-15, 18, 22)

### 3. Justifiable reliance

Eloxx, Mr. Rector, and Mr. Schmidt allege that Plaintiff fails to plausibly plead reasonable reliance because the complaint offers only a conclusory statement that Plaintiff relied on statements that he would receive the best conversion price for his shares. (D.I. 9 at 15)

According to Defendants, the integration clause in the Agreement precludes reliance on prior statements or agreements such as these. (D.I. 9 at 15; D.I. 12 at 11-12)

In response, Plaintiff contends that the misstatements and omissions identified in the complaint were made after Eloxx executed the Agreement extending the most favorable terms to Plaintiff, in an effort to induce Plaintiff to tender his stock certificate for conversion. (D.I. 20 at 18) By tendering his stock certificate, Plaintiff alleges that he adequately demonstrated his reliance on the truthfulness of Defendants' representations regarding the conversion price offered to Mr. Honig. (*Id.*) Plaintiff argues that the integration clause does not contain anti-reliance language, and it does not preclude reliance on subsequent statements made by Defendants. (*Id.*)

Section 29(a) of the Exchange Act provides: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a). In this regard, Section 29(a) "forecloses anticipatory waivers of compliance with the duties imposed by Rule 10b-5." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 180 (3d Cir. 2003) ("[I]f a party commits itself never to claim . . . reliance on any representation not set forth in the agreement," it impermissibly "purports anticipatorily to waive any future claim based on the fraudulent misrepresentations of that party."). Accordingly, anti-reliance[10] or integration clauses do not amount to an absolute bar to extra-contractual claims. *Universal Am. Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 61 F. Supp. 3d 391, 396 (D. Del. 2014).

---

[10] The integration clause at Section 3.1 of the Agreement is not consistent with the requirements of an anti-reliance clause. "[A]n enforceable anti-reliance provision must contain a promise by the plaintiff that it did not rely on extra-contractual statements." *See Heritage Handoff Holdings, LLC v. Fontanella*, C.A. No. 16-691-RGA, 2019 WL 1056270, at \*4 (D. Del. Mar. 6, 2019).

The integration clause in the Agreement does not categorically bar Plaintiff's claim of reasonable reliance under Section 10(b). *See Blattman v. Siebel*, C.A. No. 15-530-GMS, 2016 WL 1450946, at \*3 (D. Del. Apr. 12, 2016) ("As one of many factors for the court to consider, the integration clause in the Merger Agreement does not categorically bar the plaintiffs' claim of reasonable reliance."). The Agreement's integration clause is a standard provision providing that "[t]his Agreement constitutes the entire agreement, and supersedes all other prior and contemporaneous agreements and understandings, both oral and written, between the Holder and the Company with respect to the subject matter hereof." (D.I. 10, Ex. 1 at § 3.1) The representations on which Plaintiff relied, as set forth in the complaint, occurred after the execution of the Agreement. (D.I. 1 at ¶¶ 9, 14-15, 18, 21) Because the statements were made after the execution of the Agreement on January 18, 2017, and the statements were not "prior and contemporaneous agreements and understandings," they fall outside the scope of the integration clause. (D.I. 10, Ex. 1 at § 3.1)

The complaint adequately pleads that Plaintiff justifiably relied on Defendants' representations regarding the conversion price when he tendered his stock certificate. The complaint alleges that the Company reached agreement with the other remaining holder of Series A preferred shares, who agreed to convert the shares at $0.25 per share. (D.I. 1 at ¶ 21) Only after receiving these assurances did Plaintiff tender his stock certificate. (*Id.* at ¶ 22) Plaintiff subsequently learned that the remaining preferred shares had been converted at a conversion price of $0.10 per share. (*Id.* at ¶ 24) Plaintiff alleges that he would not have exchanged his Series A preferred shares if he had known Mr. Honig was offered a lower conversion price, or he would have insisted on receiving the same conversion price as Mr. Honig. (*Id.* at ¶ 41) This is

22

consistent with Plaintiff's understanding of § 2.2(g) of the Agreement, which allegedly promised that Plaintiff would receive the most favorable conversion price.

### 4. Loss causation

In support of his motion to dismiss, Mr. Honig contends that the complaint fails to allege loss causation by Mr. Honig. (D.I. 12 at 11) In response, Plaintiff contends that Defendants' misstatements caused Plaintiff's loss because those misstatements induced him to tender his stock certificate at a conversion price of $0.25 per share, instead of continuing to await confirmation that he had received the lowest conversion price. (D.I. 20 at 19)

The allegations in the complaint adequately plead loss causation. Under Section 10(b), "a plaintiff must plead 'a causal connection between the material misrepresentation and the loss.'" *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 181 (D. Del. 2010) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). The notice pleading standard of Rule 8 applies to allegations of loss causation. *Id.* Here, the complaint makes clear that Plaintiff withheld his stock certificate for months as he waited for all other holders of Series A preferred shares to convert those shares to common stock, in an effort to ensure that he would receive the most favorable conversion price. (D.I. 1 at ¶¶ 13, 20-22) Plaintiff ultimately relied on the representations of Mr. Rector, Mr. Schmidt, and Mr. Honig that all Series A preferred stock would be converted at the same price of $0.25 per share and, accordingly, he converted his shares. (*Id.* at ¶ 22) The complaint alleges Plaintiff "would have received an additional 1,200,000 shares of common stock before the 1-for-20 reverse split" if he had been offered the same $0.10 per share conversion price as Mr. Honig. (*Id.* at ¶ 32) These allegations are sufficient to establish loss causation under the relevant standard.

23

For these reasons, I recommend that the court deny Defendants' motions to dismiss the first cause of action for violation of Section 10(b) of the Exchange Act and Rule 10b-5.

## D. Common Law Fraud

To state a claim for common law fraud under Delaware law, the plaintiff must plead facts supporting an inference that: "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005). "Although a claim for common law fraud is not subject to the heightened pleading standards of the PSLRA, it still must be pled with particularity per Fed. R. Civ. P. 9(b)." *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 708 (D. Del. 2010).

Eloxx, Mr. Rector, and Mr. Schmidt contend that Plaintiff's cause of action for common law fraud should be dismissed for the same reasons as the securities fraud claim: Plaintiff failed to plead a knowingly false misrepresentation made by Defendants, the complaint fails to state that Plaintiff reasonably relied on Defendants' statements, and Plaintiff improperly raises allegations on information and belief. (D.I. 9 at 16-17) For the reasons previously set forth at § IV.C.1-3, *supra*, the complaint adequately alleges the requisite misrepresentations, scienter, and reasonable reliance[11] to sustain a cause of action for common law fraud at this stage of the proceedings.

---

[11] Separately, Mr. Honig contends that plaintiff could not reasonably rely on representations made by him because he was not an officer or director of the Company. (D.I. 12 at 10)

24

Defendants also argue that the allegations of common law fraud are not actionable because they are based on statements made by Defendants regarding future events, as opposed to a present or pre-existing fact. (D.I. 9 at 17; D.I. 12 at 8-9) Under Delaware law, predictions about future events and expressions of opinion cannot generally give rise to a cause of action for common law fraud. *See Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001). Nonetheless, Plaintiff's complaint alleges sufficiently particularized facts establishing that, at the time the representations were made, Defendants had no intention of performing. *See Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) ("Courts . . . will convert an unfulfilled promise of future performance into a fraud claim if particularized facts are alleged that collectively allow the inference that, at the time the promise was made, the speaker had no intention of performing."); *AJZN, Inc. v. Yu*, C.A. No. 13-149-GMS, 2015 WL 331937, at *9 (D. Del. Jan. 26, 2015) (noting that "a plaintiff must plead specific facts that lead to a reasonable inference that the promissor had no intention of performing at the time the promise was made.").

The complaint alleges that Mr. Rector, Mr. Schmidt, and Mr. Honig promised Plaintiff that he would receive the lowest conversion price of $0.25 per share when he converted his Series A preferred shares. (D.I. 1 at ¶¶ 10, 13-15, 18, 21) Specifically, the complaint alleges that the Company agreed to convert Mr. Honig's Series A preferred shares at a conversion price of $0.10 per share only about a month after assuring Plaintiff that Mr. Honig would receive the same $0.25 conversion price as Plaintiff. (D.I. 1 at ¶¶ 21, 23-26) Moreover, the complaint alleges that the Company amended certain convertible notes to provide the holders a conversion

However, the complaint establishes Mr. Honig's role as the lead investor and indicates that Mr. Honig contacted plaintiff with the knowledge and consent of Mr. Rector and Mr. Schmidt. (D.I. 1 at ¶¶ 9-10, 14)

25

price of $0.10 beginning in February 2017 and Defendants were aware of this amendment but, nonetheless, represented to Plaintiff that the $0.25 per share conversion price was the best available. (*Id.* at ¶¶ 27-30) These particularized factual allegations, taken as true, are sufficient show that Defendants had no intention of honoring their representations at the time they were made. *See Grunstein*, 2009 WL 4698541, at *13. The complaint therefore satisfies the standard to state a claim for fraud under Delaware law. *See S.C. Johnson & Son, Inc. v. Dowbrands, Inc.*, 167 F. Supp. 2d 657, 675 (D. Del. 2001) ("Delaware state courts view fraud cases under Delaware law as 'fact specific,' and where a party asserts several factual bases for the fraud, the Court must permit an opportunity for the parties to examine those facts.").

At oral argument, counsel for Defendants cited the court's decision in *Heritage Handoff Holdings, LLC v. Fontanella* in support of the argument that Plaintiff's fraud claim is barred because it is duplicative of the breach of contract claim.[12] In *Heritage Handoff Holdings, LLC v. Fontanella*, the court recognized that "Delaware courts routinely dismiss fraud claims that seek damages which are identical to the damages alleged for a breach of contract claim." C.A. No. 16-691-RGA, 2019 WL 1056270, at *5 (D. Del. Mar. 6, 2019) (citing *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 n.70 (Del. Super. Ct. Mar. 13, 2017)). In the present case, Plaintiff seeks "exemplary and punitive damages"[13] in connection with his cause of

---

[12] The court notes that Defendants did not address the *Heritage Handoff* decision in their opening or reply briefs. (D.I. 9; D.I. 12; D.I. 22; D.I. 23)

[13] Exemplary damages are "damages by way of punishment for wrongdoing of the defendant, and for the prevention of similar wrongs in the future." *Farrow v. Hoffecker*, 79 A. 920, 921 (Del. Super. Ct. 1906). "Exemplary damages may be allowed for torts committed with fraud, actual malice or deliberate violence or oppression." *Id.* Accordingly, punitive damages are more or less equivalent to exemplary damages. *Compare Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 454 (Del. 2013) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996)) ("[P]unitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort."), *with Oliver B. Cannon & Son, Inc. v. Fidelity & Cas. Co. of*

26

action for common law fraud, and he seeks damages "in an amount to conform to proof at trial" in connection with his breach of contract claim. (D.I. 1 at ¶¶ 55, 62) Because the contours of Plaintiff's damages claims depend on evidence presented at trial, fact issues preclude dismissing Plaintiff's cause of action for common law fraud at this stage of the proceedings. *See Heritage Handoff*, 2019 WL 1056270, at \*5 (issuing post-trial findings of fact and conclusions of law after conducting a four-day bench trial).

Moreover, Plaintiff's damages claims for breach of contract and common law fraud, as set forth in the pleading, are not duplicative. Although "a plaintiff's request for punitive damages does not sufficiently distinguish the damages claims to allow a fraud claim to stand," *Heritage Handoff*, 2019 WL 1056270, at \*5, the damages sought in support of Plaintiff's fraud claim are exclusively limited to exemplary and punitive damages, which are generally not available on a breach of contract claim, *see Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 454 (Del. 2013) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996)) ("[P]unitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort."). Unlike the allegations in Plaintiff's complaint, the plaintiff in *Heritage Handoff* sought damages as a direct and proximate result of the alleged fraud (C.A. No. 16-691-RGA, D.I. 1 at ¶ 82), and punitive damages "[i]n addition" to those damages (*id.* at ¶ 83). Likewise, the plaintiff in *EZLinks Golf* sought damages "for the alleged fraudulent inducement and breach of contract" that "appear[ed] materially identical," and the court concluded that the "mere addition of punitive damages to its fraudulent inducement charge is not enough to distinguish it from the contract damages." 2017 WL 1312209, at \*6. Because Plaintiff

*New York*, 484 F. Supp. 1375, 1387 (D. Del. 1980) ("It is the general rule in Delaware, as elsewhere, that exemplary damages usually cannot be obtained for breach of contract" unless "the breach of contract is very similar to a tort.").

27

exclusively seeks exemplary and punitive damages in support of the common law fraud claim, and because those damages are not duplicative of the damages sought for breach of contract, dismissal of the common law fraud count is not warranted on this basis.

For these reasons, I recommend that the court deny Defendants' motion to dismiss Plaintiff's cause of action for common law fraud.

## E.    Liability Under Section 20(a) of the Securities Exchange Act[14]

An individual who controls a violator of Section 10(b) of the Exchange Act may be liable under Section 20(a). *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006); *see also* 15 U.S.C. § 78t(a). To state a claim under Section 20(a), the plaintiff must plead that one person controlled another person, the "controlled person" is liable under the Exchange Act, and the defendant was a "culpable participant" in the violation of the Exchange Act. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484-85 (3d Cir. 2013). Under the PSLRA, a claim under Section 20(a) must state with particularity the circumstances of the defendants' control of the primary violator, and also the defendants' culpability as controlling persons. *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002); *see also Snowstorm*

---

[14] Plaintiff's second cause of action for violation of Section 20(a) of the Exchange Act is alleged against "All Defendants." (D.I. 1 at 12) However, paragraph 47 of the pleading suggests that the claim is not asserted against defendant Eloxx: "By virtue of their positions as controlling persons, the members of the Control Group [Rector, Schmidt, and Honig] are liable pursuant to § 20(a) of the Exchange Act." (*Id.* at ¶ 47) The exclusion of Eloxx from liability under Section 20(a) at paragraph 47 appears to be consistent with Third Circuit precedent indicating that Section 20(a) claims may only be properly asserted against individuals. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) ("Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)."); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006) (vacating dismissal of plaintiffs' Section 20(a) claims against the Officers); *see also Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 485 n.4 (D. Del. 2019) and C.A. No. 16-112-MN, D.I. 59 at ¶¶ 160-61 (asserting Section 20(a) claim only against the Officer Defendants).

*Acquisition*, 739 F. Supp. 2d at 707 (holding that a securities fraud plaintiff must prove "not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.").

For the reasons previously stated at § IV.C, *supra*, the complaint adequately alleges an underlying cause of action against Defendants pursuant to Section 10(b) of the Exchange Act. However, Defendants allege that the complaint contains no particularized facts showing that Mr. Rector and Mr. Schmidt controlled any person who violated Section 10(b), or that Mr. Honig controlled a violator of Section 10(b). (D.I. 9 at 18; D.I. 12 at 12-13) In response, Plaintiff alleges that Mr. Rector and Mr. Schmidt are liable under Section 20(a) because they exercised control over the terms of conversion offered to preferred shareholders in their capacities as CEO and CFO, respectively. (D.I. 20 at 22) Moreover, Plaintiff alleges that Mr. Honig exercised control as the "lead investor" of the Company who was directly involved in efforts to convert all outstanding Series A preferred shares to common stock. (*Id.*)

I recommend that the court deny Defendants' motions to dismiss Plaintiff's cause of action under Section 20(a) because the complaint adequately alleges that each of the Defendants exercised control over the other Defendants. As a preliminary matter, "[t]here is no rule that prevents a plaintiff from alleging a § 20(a) violation and § 10(b) violation against the same defendant." *Universal Am. Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387, 398 (D. Del. 2016). Plaintiff's allegations against Mr. Honig, Mr. Rector, and Mr. Schmidt as both primary violators and control persons under Sections 20(a) and 10(b) of the Exchange Act do not require dismissal because the complaint alleges "numerous misrepresentations . . . against multiple defendants." *Id.* at 399.

29

With respect to Mr. Honig, the complaint alleges that the Company was low on capital and required new financing, which could only be obtained after all Series A preferred shareholders converted their shares to common stock. (D.I. 1 at ¶¶ 9, 14) The complaint identifies Mr. Honig as the lead investor in the Company who exercised control over Mr. Rector's actions as an officer of the Company. (D.I. 1 at ¶¶ 5, 14) The complaint supports this allegation by stating facts showing that Mr. Honig directly pressured Plaintiff to tender his stock certificate with the knowledge and support of Mr. Rector and Mr. Schmidt. (*Id.* at ¶¶ 9-10, 14-15, 18) These factual allegations are sufficiently detailed to satisfy the particularity standard for a cause of action asserted pursuant to Section 20(a).

The complaint also alleges particularized facts showing that Mr. Rector and Mr. Schmidt exercised control over Eloxx. The fact that Mr. Rector and Mr. Schmidt are officers of the Company is not sufficient by itself to establish their control for purposes of Section 20(a). *See Digital Island*, 223 F. Supp. 2d at 561-62 (holding that service as directors, by itself, is insufficient to demonstrate control pursuant to Section 20(a) absent specific allegations regarding management responsibilities). Nonetheless, their roles as CEO and CFO, respectively, combined with the complaint's particularized allegations that they actively coordinated the merger transaction and conversion of Series A preferred shares to common stock, suffices to state a claim under Section 20(a) at this stage of the proceedings. *See Snowstorm*, 739 F. Supp. 2d at 707-08 (concluding that the complaint adequately pleaded that the vice president "was a major player in the operations of that company" for purposes of Section 20(a)).

### F.    Rule 11 Sanctions under the PSLRA

Mr. Honig requests the imposition of Rule 11 sanctions against Plaintiff for the allegedly frivolous claims asserted against him in the complaint. (D.I. 12 at 13-14) The PSLRA provides

that, "[i]n any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). If the motion to dismiss is denied, the mandatory review provision is not triggered because there is no final adjudication. *See Springer v. Kilhefner*, 2019 WL 3816839, at \*9 (E.D. Pa. Aug. 14, 2019).

I recommend that the court deny Mr. Honig's request for sanctions. For the reasons previously discussed, I recommend that the court deny Mr. Honig's motion to dismiss. *See* § IV.C-E, *supra*. In the event that the court adopts this recommendation, no final judgment would be entered in favor of Mr. Honig and the mandatory review provision of the PSLRA would not be triggered.

## V. CONCLUSION

For the reasons discussed above, I recommend that the court grant-in-part the motion to dismiss filed by Eloxx, Mr. Rector, and Mr. Schmidt. (D.I. 8) Specifically, I recommend that the court grant the motion to dismiss the cause of action for breach of the implied covenant of good faith and fair dealing, and deny the motion in all other respects. I further recommend that the court deny Mr. Honig's motion to dismiss. (D.I. 11)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right

31

to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: January 21, 2020

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE